# Exhibit 3

                                    **Pages 1 - 44**

                        UNITED STATES DISTRICT COURT

                       NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

NINA PEDRO, individually and   )
on behalf of all others        )
similarly situated; et al.,    )
                               )
            Plaintiffs,         )
                               )
   VS.                         )        **NO. C 15-05253 MMC**
                               )
MILLENNIUM PRODUCTS, INC., et  )
al.,                           )
                               )
            Defendants.         )
_____)


                             San Francisco, California
                             Friday, April 15, 2016

                        **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                        MORGAN & MORGAN
                        One Tampa City Center
                        201 North Franklin Street - 7th Fl.
                        Tampa, Florida  33602
            **BY:  MARCIO W. VALLADARES, ATTORNEY AT LAW**

For Defendants Millenium Products, Inc., and George Thomas "GT"
Dave:
                        O'MELVENY & MYERS LLP
                        400 South Hope Street
                        Los Angeles, California  90071
            **BY:  SCOTT M. VOELZ, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

Exhibit 3 - Page 6

2

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant Whole Foods Market California, Inc.:
                         LTL ATTORNEYS
3                        601 Gateway Blvd. - Suite 1010
                         South San Francisco, California  94080
4                   BY:  **KEVIN BRINGUEL, ATTORNEY AT LAW**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 3 - Page 7

```
 1   Friday - April 15, 2016                        9:02 a.m.

 2                     P R O C E E D I N G S

 3                         ---000---

 4        THE CLERK:  Calling Civil Case Number 15-5253, Nina

 5   Pedro versus Millennium Products.

 6        Will counsel please step forward and state your

 7   appearances for the record.

 8        THE COURT:  Good morning.

 9        MR. VOELZ:  Good morning, Your Honor.  Scott Voelz,

10   O'Melveny & Meyers, for defendant Millennium Products and "GT"

11   Dave.

12        THE COURT:  Thank you.  Good morning.

13        MR. BRINGUEL:  Good morning, Your Honor.  Kevin

14   Bringuel of LTL Attorneys for defendant Whole Foods California,

15   Inc.

16        THE COURT:  All right.  Thank you.

17        MR. VALLADARES:  Good morning, and may it please the

18   Court, Your Honor.  Marcio Valladares with Morgan & Morgan

19   Complex Litigation Group on behalf of the plaintiffs.

20        THE COURT:  All right.  A couple of counsel, including

21   Mr. Valladares, were not on our calendar essentially as counsel

22   who are representing the parties.  Should we be adding you

23   then, Mr. Valladares?  Is this your case?

24        MR. VALLADARES:  Actually, I'm filling in for

25   Mr. Yanchunis who had a last-minute change.  So actually I had
```

Exhibit 3 - Page 8

1  to make the arrangements yesterday.

2        **THE COURT:**  Oh.

3        **MR. VALLADARES:**  I'm moving to enter an appearance in

4  the case, though, because I will be working with him in this

5  matter.

6        **THE COURT:**  Okay.  This is a different firm or same

7  firm?

8        **MR. VALLADARES:**  It's the same firm, Your Honor.

9        **THE COURT:**  Same firm?

10        **MR. VALLADARES:**  Yes.

11        **THE COURT:**  Okay.  What about Mr. Bringuel?  Is this

12  going to be a case you'll be appearing in?

13        **MR. BRINGUEL:**  I'm just temporarily standing in for

14  Mr. Tuffaha, Your Honor.  I'm from our Northern California

15  office.

16        **THE COURT:**  Oh, all right.  Very good.

17        **MR. BRINGUEL:**  He's from the Los Angeles office.

18        **THE COURT:**  I see.  All right.

19     Well, all right.  Can the attorneys who are here today

20  actually speak for the clients beyond possibly just arguing

21  these papers?  Because I have some questions that are raised by

22  some of the comment in the papers, as well as the legal issues.

23        It sounded like, Mr. Valladares, that the plaintiffs might

24  be interested actually in getting the two cases together, the

25  LA and San Francisco case, in one place; is that correct or

Exhibit 3 - Page 9

1   not?

2        **MR. VALLADARES:**  Your Honor, I believe that there's --

3   we reached out to counsel in the Retta matter, and I checked on

4   our co-counsel, Josh Watson with the Clayeo law firm, and he

5   said he's not heard back; but that's something that we're

6   contemplating to see about a transfer either to here -- or

7   preferably, from our standpoint, here as opposed to the Central

8   District.

9        **THE COURT:**  Well, the thing is, though, that the case

10  in the Central District has got a trial date already.  It's

11  moving forward fairly expeditiously actually.  It was filed, I

12  don't know, six months or so before this case, not that long

13  ago, and it's already at least nailed down pretty well.

14       So, all right.  Well, let's go back.  At the time that the

15  opposition was filed, plaintiff had stated you were looking

16  into this, "We're going to reach out."  Apparently you're still

17  reaching.  So we don't really know what's going on there in

18  terms of an agreement, so to speak, as to what might be best

19  here.

20       I did look at the case law that you've both relied on,

21  including a case of mine from about eight years ago.

22  Interestingly, in that case, which has now been cited

23  occasionally and not followed by some number of

24  District Courts, the issue was not really fully presented to me

25  at the time.

Exhibit 3 - Page 10

1       In other words, the parties were talking about the classes

2   and one party was saying, "Gee, I think they overlap," and the

3   other says, "No, I don't think they overlap that much."  But

4   nobody really talked about, "Should we move now before there's

5   a certification or not?"

6       And so the whole concept of whether it's premature to look

7   at classes and compare them before at least one of them has

8   been certified really hadn't come up, and it does seem that the

9   majority of the District Courts that have looked at this from a

10  more fully presented, if you want, standpoint have looked at

11  the putative class as opposed to a certified class or the named

12  plaintiffs who you could always look at, of course.

13      So I think that in terms of similarity, that these classes

14  are similar enough.  The real question is whether the issues

15  are sufficiently similar.  Certainly if the Retta case were the

16  larger case and essentially just ate up all of the case that we

17  have, the Pedro case, there wouldn't be any problem.  The

18  question is really whether the second case presents issues that

19  for one reason or another should preclude a stay or transfer.

20      In reading over the cases, I do think there's enough of an

21  overlap here.  Although the plaintiff is downplaying now the

22  alcoholic content, it played a very significant role in all of

23  the counts, and essentially is the totality of the claim in the

24  third cause of action.  It's all based on alcohol.

25      I'm sure that the idea of exploding bottles and leaking

Exhibit 3 - Page 11

1   bottles and damaged purses and this woman who got her eye cut

2   are all very dramatic and certainly attention getting, but that

3   would have to be on an individual cause of action.  You're not

4   going to be able to have a class action with all these

5   different problems that people had.

6       And at the last calling of the case, the plaintiffs'

7   counsel disavowed any interest in pursuing a claim based on

8   personal injury or property damage outside of whatever damage

9   there was to the individual product that they bought and, thus,

10  allege they can't use.

11      So there is a difference.  But if we're not looking at

12  dismissal or even a stay and are just looking at a transfer,

13  then everything could be heard together, the overlapped claims

14  and the ones that don't overlap.

15      So I think it really is a discretionary call to a certain

16  extent here.  Let me hear from Mr. Valladares because -- just

17  to reassure you, I wouldn't be staying.  If I do something

18  here, it would be a transfer.  Okay?

19          **MR. VALLADARES:**  Thank you, Your Honor.

20      And I agree fully that a stay would be inappropriate in

21  the sense that, one clarification I want to make is that if you

22  look at our Complaint, the alleged defects, which appear at

23  page 2, there are five enumerated defects, of those defects,

24  number five is the alcohol.

25          **THE COURT:**  There's really only two.  It kind of goes

Exhibit 3 - Page 12

8

1  like this:  It blew up.  It leaked.  You know, it's problematic

2  for that reason.  And after about four times of describing how

3  it doesn't stay in the bottle, you got to number two.  One has

4  to be one.  One has to be two.  And it ended up the last claim

5  wraps it up with, you know, the second theory.

6       So I don't think you can say, "We soft-pedaled this.  It

7  isn't as dramatic, you know"; but if you were going on a

8  personal injury case, I could say, "Yes, obviously what you

9  really care about is this woman had five stitches, or whatever

10  she needed, and is possibly going to lose her eye.  And, by the

11  way, they lied about the alcoholic content."  But that's not

12  the case.  The case is it's both.

13       MR. VALLADARES:  Yes, Your Honor, but we would argue

14  that it is not a personal injury matter.

15       THE COURT:  I know.

16       MR. VALLADARES:  That was just an example of sort of

17  the danger that exists, and a lot of class actions are based on

18  defects that can cause danger to the public.

19       THE COURT:  I don't know that you're really relying on

20  the danger as much as you're relying on the unusability.  My

21  understanding is that nobody's going to get emotional distress

22  for being put in danger here.  Nobody's going to get a personal

23  injury claim or a property damage claim for their damaged

24  Louis Vuitton bag or whatever happened to Ms. -- well, not

25  Ms. Pedro but the other plaintiff.

Exhibit 3 - Page 13

1    You really are simply looking at we can't use this stuff

2    and, besides that, it's got an alcoholic content that you

3    didn't disclose.  Kind of like the Woody Allen movie, "The

4    food's lousy and the portions are too small."  All right.

5    Okay.  You've got two claims here.

6        MR. VALLADARES:  But, Your Honor, I think -- so

7    there's this -- there's the danger component, as you pointed

8    out, but there's also --

9        THE COURT:  Yeah, I'm not pointing it out.  You are,

10   but you're not claiming it.

11       MR. VALLADARES:  I'm sorry.

12       THE COURT:  Okay.

13       MR. VALLADARES:  We are asking the Court, in fact, for

14   injunctive relief.  We have engaged experts for a number -- for

15   two years now that have been looking at these products, have

16   been -- have explosion labs to see how they work, not just for

17   defendants but for other products as well.  They've been

18   working on this quite a while.  We put a lot of money into

19   this.

20       We do feel it is a safety issue, and also that it could be

21   remedied, as we state in our response to the motion to stay, by

22   injunctive relief.

23       THE COURT:  Let's look at that for a minute.  That's

24   an interesting point.  So, let's see, prayer for relief.

25       Let's see... Does enjoining the wrongful conduct alleged

Exhibit 3 - Page 14

```
 1    here... Okay.

 2              MR. VALLADARES:  Yeah, it is --

 3              THE COURT:  And where --

 4              MR. VALLADARES:  If you look, Your Honor -- may I?

 5    I'm sorry -- at page 30 of our Complaint at the top:  (reading)

 6                 "On information and belief, plaintiffs assert that

 7         expert information to be exchanged in this matter, much of

 8         which has been obtained through prefiling forensic

 9         investigation and laboratory testing, will provide the

10         court with discrete, enforceable standards from which to

11         fashion an appropriate injunction."

12              THE COURT:  It's relatively cryptic, I would say, not

13    very specific.

14              MR. VOELZ:  Your Honor --

15              THE COURT:  Well, let Mr. Valladares finish, and then

16    you can step in.

17         Okay.  So what you're saying is that there's an entirely

18    different form of relief that you would be seeking here.  Okay.

19         All right.  Anything else that you wanted to add to that?

20              MR. VALLADARES:  Well, and there's -- and it's not

21    just speculative.  We feel very strongly that experts can show

22    that there's a different way of bottling this because of the

23    inherent secondary fermentation that occurs with this product;

24    that the cap can be done in such a way that it allows for

25    additional pressure.  For instance, as the chia seeds grow in
```

Exhibit 3 - Page 15

1  volume and the pressure builds up, that would render this

2  product, although perhaps not in its substance and its chemical

3  composition, any different but certainly in its packaging and

4  its container, plastic versus glass, for instance.  I'm not an

5  expert, but preliminary assays of that have indicated that

6  that's a possibility.

7       And I know that in the *Adoma* court, which cites to

8  Your Honor's opinion from 2008, it does look specifically at

9  the remedy and the relief that's requested as a major component

10  of finding that the issues are different in the case.

11            THE COURT:  Okay.

12            MR. VALLADARES:  And I feel that -- and the plaintiffs

13  certainly feel that that's a very different component.  And

14  certainly if that were to be stayed, nothing in the Retta

15  matter will resolve that issue.

16            THE COURT:  Okay.

17            MR. VALLADARES:  That's not even raised.

18            THE COURT:  Okay.  So the point is that in Retta, the

19  relief, even if injunctive relief, would just be relabel this

20  stuff; and in your Complaint, the relief could encompass

21  repackaging entirely with different materials or whatever.

22            MR. VALLADARES:  Repackaging entirely and perhaps

23  labeling changes.

24            THE COURT:  Yeah, well, okay.  All right.

25       So we'll go over here to Mr. Voelz then.

Exhibit 3 - Page 16

1           **MR. VOELZ:**  Thank you, Your Honor.

2       One point that you picked up on in your initial comments,

3    on paragraph 147 of the Complaint, which is the third count

4    which relates to the CLRA count, the injunctive relief sought

5    there is entirely akin to what is sought in Retta, which also

6    seeks some injunctive relief as well.

7       So, you know, it's not that the injunctive relief sought

8    here doesn't overlap.  There is overlap even in the injunctive

9    relief that is sought.  As I said, paragraph 147 on page 34.

10          **THE COURT:**  Yeah, I'm just double-checking that.  I

11   have it here.  It's relatively short.

12      Yes.  It says that the parties seek injunctive relief in

13   the form of revised labeling or pasteurization techniques so

14   that people don't inadvertently, well, consume an alcoholic

15   beverage.

16      The paragraph that was pointed out by Mr. Valladares, what

17   was that -- where was that again?  Just so I can find it.

18          **MR. VALLADARES:**  Yes, Your Honor.  That was on page --

19          **THE COURT:**  It's in a different cause of action.  Oh,

20   here it is.

21          **MR. VALLADARES:**  30 --

22          **THE COURT:**  Yeah, page 30 at the top.  Okay.  That's

23   paragraph 132.  So let me go back to the beginning of that one

24   for a minute, if I could.

25          **MR. VOELZ:**  Sure.

Exhibit 3 - Page 17

```
 1                    (Pause in proceedings.)

 2          THE COURT:  Well, I guess where you would maybe be

 3     relying on the so-called danger here is the phrase at the end

 4     of 26 over to 27, "without modifying the packaging and/or

 5     labeling."  So defendants continue to sell the products without

 6     modifying the packaging and/or labeling.

 7          But even that could simply be a focus on the labeling, but

 8     it could -- all right -- encompass, I guess, this idea that it

 9     leaks but isn't necessarily a danger in terms of explosion.

10          I think the argument here is the stuff is fermenting, and

11     I don't think the defendant is selling this as booze.  They're

12     selling it as some kind of health drink.

13          Are these the kind of seeds they made those pets out of a

14     number of years ago?

15          MR. VALLADARES:  The chia seeds, yes, Your Honor.

16          THE COURT:  Okay.  All right.

17          MR. VALLADARES:  That's one of them.

18          MR. VOELZ:  That's one of the varieties.

19          THE COURT:  Okay.

20          MR. VOELZ:  Your Honor, there are a variety of product

21     lines.  Some have chia, some don't.

22          THE COURT:  All right.

23          MR. VOELZ:  But, Your Honor, you know, with respect to

24     the injunctive relief, they're also seeking, you know,

25     restitution and monetary damages.  I would note that the
```

Exhibit 3 - Page 18

```
 1   classes are entirely overlapping.   In fact, the Pedro class

 2   is --

 3            THE COURT:  Bigger.

 4            MR. VOELZ:  Well, no.  Actually, Your Honor, the time

 5   frame is shorter in Pedro than in Retta.  So it is -- you know,

 6   it seeks a nationwide class within the last two years.  Retta

 7   actually has causes of action that go back four.

 8            THE COURT:  Well, but it also covers all of your

 9   client's products of this nature, not just the most recent

10   product.

11            MR. VOELZ:  Well -- I'm sorry.

12            THE COURT:  No.  Go ahead.

13            MR. VOELZ:  But, Your Honor, when we're talking about

14   particularized purchases from class members, I mean, there is,

15   you know, a single or multiple.  A person purchases how many

16   bottles of these they are going to purchase.  Those purchases

17   are at issue in both Retta and Pedro.

18       So you have a plaintiff John Smith who purchases four

19   bottles over the course of the last two years.  Those purchases

20   and the impacts of those purchases are at play in both cases.

21   There's not -- there's not multiple purchases.  We're not

22   talking about different people.

23       In terms of -- so, you know, I do want to go back to the

24   idea that I do think a stay is appropriate here.  I understand

25   the Court's hesitancy; but, you know, certainly with respect to
```

Exhibit 3 - Page 19

1  transfer, as we said, you know, we're not opposed to

2  transferring to the Central District.  It would be, you know,

3  frankly, given Millennium's location, more convenient for it;

4  and given the pace and the progress in the Retta case, that

5  seems to be the appropriate situation here.  It was first

6  filed.  You know, it has progressed further down the road than

7  this case has.  So, you know, at a minimum, Your Honor, I think

8  a transfer is appropriate here.

9       **THE COURT:**  You know, one of the things that caught my

10  attention initially in your opposition to a transfer was the

11  concern that if this case is sent to LA, that it will drag down

12  the other case, slow it down and knock it off its trial

13  schedule because of any -- frankly, if there weren't any

14  different issues, it shouldn't do that unless somebody's own

15  trial schedule, personally counsel's schedule, was inconsistent

16  with whatever had been set.  But there are new issues, and

17  that's what, you know, the plaintiff is relying on here to

18  oppose any kind of a connection, if you will, between the two

19  cases.

20       Let me go back to Mr. Valladares for just a second.  Well,

21  what's your view about that at this point?  I assume you still

22  feel some concern about slowing down Retta.

23       **MR. VOELZ:**  Well, Judge Gutierrez has kept us to a

24  pretty efficient schedule.

25       The pleadings are not entirely set in Retta.  They are

Exhibit 3 - Page 20

```
 1   with respect to my client but not with respect to Whole Foods.
 2           MR. BRINGUEL:  The defendants are slightly different
 3   in the two cases --
 4           THE COURT:  True.
 5           MR. BRINGUEL:  -- which I think is what presents the
 6   danger of slowing it down.
 7           THE COURT:  Yes, well -- let's see, you've got the
 8   named individual?
 9           MR. VALLADARES:  Uh-huh.
10           THE COURT:  Yes.
11           MR. VALLADARES:  The founder of the company.
12           THE COURT:  Right.  What else is different?
13           MR. BRINGUEL:  The Whole Foods entities that are named
14   are different entities.
15           THE COURT:  They are different Whole Foods?
16           MR. BRINGUEL:  And there's a pending motion to dismiss
17   in the other case on the Whole Foods entity.
18           THE COURT:  Based on what, you've got the wrong
19   Whole Foods?
20           MR. BRINGUEL:  I believe that's the allegation in the
21   Los Angeles case, it's the wrong Whole Foods.
22           THE COURT:  So we might assume that if your client is
23   right, that they just named the wrong Whole Foods, that the
24   plaintiffs in that case would then ask to name the other
25   Whole Foods, and then it would be the same Whole Foods as we
```

Exhibit 3 - Page 21

1    have in our case?

2          MR. BRINGUEL:  It would and because their discovery is

3    more advanced than ours, then we would need to play catch-up,

4    and I think that's the danger of slowing down the LA action,

5    Your Honor.

6          THE COURT:  You mean you haven't done much because

7    you've been complaining that it's the wrong Whole Foods?

8          MR. BRINGUEL:  I think it's a separate -- it's a

9    separate entity, and so I'm actually not familiar with what

10   discovery they've done.

11         THE COURT:  Oh, okay.  Gotcha.

12         MR. BRINGUEL:  But certainly Whole Foods California,

13   Inc., has not done the discovery that's occurred in

14   Los Angeles.

15         THE COURT:  I see.  Okay.  So who is the Whole Foods

16   down there?

17         MR. BRINGUEL:  I might get the name wrong, Your Honor,

18   but I believe it's a national holding company rather --

19         MR. VOELZ:  Whole Foods Market, Inc.

20         MR. BRINGUEL:  Oh, right there.  Whole Foods Market,

21   Inc.

22         MR. VALLADARES:  Your Honor, just --

23         THE COURT:  I'm thinking about the nickname for the

24   market.  Yeah, go ahead.

25         MR. VALLADARES:  Your Honor, I was just going to point

Exhibit 3 - Page 22

1    out that, number one, just a slight point.  In addition to the

2    packaging and things like that, inherent in this product -- and

3    we've seen this through testing of our own and we've cited

4    examples in our Complaint that are just abound in the Internet,

5    that replicate itself in the Internet, that was just a fraction

6    of what we saw -- is that by -- the product inheres in it an

7    effervescent.

8         And, actually, I learned about this long before I got

9    involved in this when my sister got one of these bottles,

10   opened it up, and half of it spilled out.  It didn't shoot out

11   as some of the claims state, but you lose the product.  You are

12   losing value for what you've paid for.

13             THE COURT:  Right.

14             MR. VALLADARES:  And this is not a cheap product,

15   Your Honor.  It's very expensive to the average American, I

16   believe.  And so there is -- there is an unfair deceptive trade

17   practice there.  There's a loss of value that the customer is

18   not getting what he or she thinks on top of the safety issues

19   but in addition to the quantity of product that's there.

20        It's a very -- I should say from our standpoint, that it's

21   recurring enough to certainly provide a claim for relief, and

22   that's why we've asserted that as one of the defects.  That's

23   not just, "Oh, we thought of this."  It is actually something

24   that happens a lot, and we believe that customers are buying an

25   expensive bottle and in the end are drinking half of it or

Exhibit 3 - Page 23

1  whatever it is, a fraction of it, because a lot of it goes on

2  the floor.  Forgetting about what happens to the walls,

3  forgetting about what happens to the handbag --

4          THE COURT:  Right.

5          MR. VALLADARES:  -- forgetting about what happens to

6  the car, et cetera, there is that.

7      In addition, Your Honor, if you look at the two named

8  plaintiffs here, Nina Pedro only talks about the packaging, the

9  danger, spoliation of the product, the lack of full use of the

10  product.  Lewis only talks about the alcohol component.

11      So it does affect them differently, and I think -- we were

12  talking about the definition of classes; and as you know,

13  Your Honor, we allege a class that is broad but it's, of

14  course, subject to modification as discovery provides and

15  proceeds.  And we allege in the Complaint, in fact, as we do in

16  all class action Complaints, that the class definition is

17  subject to redefinition based on the evidence and what's

18  encountered.

19          THE COURT:  Okay.  Let me just ask you on -- actually,

20  that description is more or less how I was looking at the case.

21  In other words, once you took out the damage to materials other

22  than the product itself and any danger that the packaging might

23  present, which really wasn't focused on, frankly, as a basis

24  for relief, you have the question, then, of "We didn't get what

25  we paid for.  We paid for X number of ounces, and half of them

Exhibit 3 - Page 24

1    came out of the bottle and not into us.  And, furthermore, it

2    isn't what we thought we were buying."

3         That's why I used the Woody Allen example, "The portions

4    are too small.  Anyway, the food isn't any good."  And so it's

5    like, "We didn't get enough of what we didn't want anyway."

6         And let me just ask you in that regard, when you were

7    looking at *Adoma* and mentioned about the court focusing on the

8    difference in the relief sought or the similarity in the relief

9    sought -- do you just want to find that for a minute, if you've

10   got the case handy, and point out to me?  I have the case here.

11   I obviously read it.

12            **MR. VALLADARES:**  Yes, I do, Your Honor.

13        **THE COURT:**  And then I do want to talk about what that

14   court did find in terms of asymmetrical claims, but I'd like to

15   see your part that you thought was particularly interesting as

16   well.

17            **MR. VALLADARES:**  Sure, Your Honor.  And *Adoma*, of

18   course, is found at 711 F.Supp. 2d 1142 --

19        **THE COURT:**  Right.  And it has --

20            **MR. VALLADARES:**  -- and it's the Eastern District of

21   California.

22        **THE COURT:**  Right.  And it has been cited favorably by

23   the Ninth Circuit without any distinction in the various

24   grounds on which it was decided all being essentially cited

25   favorably.

Exhibit 3 - Page 25

```
 1        So let's assume that the judge is right in this case, but

 2   where are you focusing when you're talking about the relief

 3   aspect?

 4        MR. VALLADARES:  Yes, Your Honor.  If you look at

 5   Headnote -- I'm sorry -- Star pages 12.  I'm trying to see

 6   where it begins talking about Your Honor's opinion in Lac Anh

 7   Le.  That's, I believe, at page 1147.

 8        THE COURT:  I think you're correct.  Similarity of the

 9   parties, but that doesn't have to do with the relief.

10        MR. VALLADARES:  Right.  I was just pointing out that

11   that's something that's discussed there.

12        THE COURT:  Uh-huh, yes.

13        MR. VALLADARES:  What I want to point the Court to

14   is --

15        THE COURT:  We're not on that issue.  That's the

16   parties' issue.  We're on the claims issue.  Okay.

17        MR. VALLADARES:  Right.  And what I was saying there

18   is that the court --

19        THE COURT:  Okay.  Could you find, please, the part in

20   here to which you're citing?  And then you can get back to

21   whatever else you want to say.

22        MR. VALLADARES:  Okay.  Your Honor, if you could

23   please look at page 150 with the paragraph beginning with "The

24   Court is persuaded that the equities in this case..."

25        THE COURT:  Okay.  Just a moment.  A paragraph
```

Exhibit 3 - Page 26

1  beginning "The Court" -- oh, yes.  Toward the end of 150.

2  Okay.  Okay.

3          **MR. VALLADARES:**  Equity basically, according to *Adoma*,

4  can trump the first prong --

5          **THE COURT:**  Well --

6          **MR. VALLADARES:**  I'm sorry.

7          **THE COURT:**  -- let me look at it for a minute before

8  you paraphrase or spin off it.

9                        (Pause in proceedings.)

10         **THE COURT:**  Okay.  All right.  So in there the court

11  states that because the plaintiff also seeks relief under

12  California state law and that requires entirely different

13  calculations for overtime compensation, that judicial resources

14  will not be significantly conserved.  Well, maybe.

15     Okay.

16                        (Pause in proceedings.)

17         **THE COURT:**  Okay.  All right.  Well, you could read

18  that, then, to apply to the argument that you're making here.

19  Okay.

20         **MR. VALLADARES:**  Yes, Your Honor.  My only point about

21  bringing up your case being cited here is that the court does

22  go through the effort of showing that Your Honor issued that

23  opinion 2008, but the courts don't necessarily agree as to --

24         **THE COURT:**  We are past that.  I brought it up at the

25  beginning, Mr. Valladares.  I've already said that the fact

Exhibit 3 - Page 27

 1    that the parties -- the parties -- are not named the same is

 2    not going to be the issue, and I am not requiring that there be

 3    a certification of a class beforehand because it does seem to

 4    me that the courts have generally now found that we're looking

 5    at the putative class.

 6         So I think we're past that.  We're talking about the

 7    issues here that are being raised by the Complaints, not who

 8    raised them at the moment.

 9              **MR. VALLADARES:**  But I would argue, and I know -- I

10    would argue, Your Honor, that part of the equitable relief

11    analysis in *Adoma* says that the relief sought and the damages

12    sought frame what the class is too and can make the classes

13    different, and that's what we argue in this case.

14              **THE COURT:**  Well, no, I don't think that's -- they're

15    not saying the people are different.  They're saying the issues

16    are different.  The issues are different because different

17    damages analysis is required, but the people are whoever they

18    are.

19         We have in this instance -- I don't think you can say

20    that -- for example, these are people who bought the stuff.

21    All right?  So the difference is that your class, to the extent

22    it's different than the Retta class, is your class includes

23    people who bought more or different product along with the same

24    product.

25         So your class can either have individuals that only bought

Exhibit 3 - Page 28

1    the new product or they could have bought a former version or

2    some other version that is claimed in Retta, but enough people

3    apparently are also claiming that they bought the same product

4    as in Retta.  But that's it.  It's people who bought, not what

5    you want to tack on to what happened because what happened to

6    them is all the same.  The people in Retta had leaking bottles

7    too.  They're just not complaining about them at the moment.

8                    MR. BRINGUEL:  And if I may, Your Honor.

9                    MR. VALLADARES:  But, Your Honor, if I may --

10                   THE COURT:  It's the issue.  No.  I'm going to hear

11   from them.  You're beating a dead horse here.

12                   MR. BRINGUEL:  Following up on the Court's point, this

13   class is a subset of Retta.  It's smaller.  If it includes

14   people who bought the drink plus other things, it is

15   necessarily smaller than Retta, which is just people who bought

16   the drink.

17                   THE COURT:  It's narrower, but --

18                   MR. BRINGUEL:  That's what I mean.

19                   THE COURT:  No.  I'm sorry.  It's not narrower.  It's

20   broader.  They've got the Retta product and other products, so

21   they're broader, but that's people.  That's not the -- all of

22   these products, as far as I understand, according to all of the

23   plaintiffs, behave in the same way.  They have alcohol that's

24   created unintentionally and they leak; and apparently they're

25   claiming they've got some other benefit, according to the Retta

Exhibit 3 - Page 29

1    plaintiffs, in the form of antioxidants that the Retta

2    plaintiffs say isn't in there.

3        So what you have is you have a core of it's got alcohol in

4    it.  All right?  And, you know, if they want to buy alcohol,

5    they can go buy scotch, bourbon, vodka.  They don't have to buy

6    this tea stuff.

7        Then you have in our case a claim that the stuff leaks,

8    and in the Retta case that there's an overstatement as to

9    whether or not it's got this health benefit of the

10   antioxidants.

11       And then the relief, which is what Mr. Valladares I

12   thought was relying on, since he stressed that from the get-go,

13   was that there's a different relief he says being sought here

14   because the plaintiffs are concerned about a safety feature,

15   but then later that morphed into it's leaking.  And, frankly, I

16   suppose you could change the label and have the stuff still

17   leak out.

18       If this case is resolved in some way, you know, all the

19   problems are going to have to be fixed.  People aren't going to

20   buy it because it stops having -- if it stopped having alcohol,

21   then it won't be fermenting, then it won't leak.  It's all kind

22   of -- you know, each thing is connected to the other.

23       So, all right.  I'll hear from the defendants again and

24   then we'll see where we go.

25           **MR. VOELZ:**  Thank you, Your Honor.

Exhibit 3 - Page 30

```
 1         Going back to a point that I made earlier, the

 2    purchases -- there's two product lines here.  There's the

 3    Enlightened product line and there's the Classic product line.

 4    They both coexist in the market at the same time.  They're both

 5    still on the market.  The Retta case involves the Enlightened

 6    line.  The Pedro case involves --

 7              THE COURT:  Both.

 8              MR. VOELZ:  -- appears to involve both.

 9         You know, the allegations of alcohol levels, you know, the

10    Classic line is sold as an alcoholic beverage.  It is certified

11    by the TTB, and so alcohol is not an issue in that case.

12              THE COURT:  You're actually selling that as an

13    alcoholic beverage?

14              MR. VOELZ:  Correct.

15              THE COURT:  It's only a question of how much is in

16    there, is that the --

17              MR. VOELZ:  Correct.  Everyone acknowledges, in fact

18    the Enlightened label says that there's a trace amount of

19    alcohol in the product.

20         The question is whether the fermentation process, because

21    there are different formulations between Enlightened and

22    Classic -- Classic does have alcohol levels that exceed .5,

23    which is now called beverage under TTB, and so it's licensed as

24    such and sold as such.

25         But the issue here with respect particularly to
```

Exhibit 3 - Page 31

1   Enlightened where there's definitive overlap between the two

2   classes, you know, I go back to my point I made earlier, which

3   is these are the same purchases.  Not the same people, but

4   they're the same purchases.  You're talking about the same

5   bottle.  They're alleging overlapping defects and some defects

6   that may not be overlapping, but let me give you a for

7   instance, Your Honor.

8       In Retta they're seeking -- and, you know, obviously we

9   disagree with this formulation, but they're seeking restitution

10  of the whole value of the product.  If they were to succeed --

11  which, you know, we think there are various legal and factual

12  reasons why they won't -- but if they were to succeed, the

13  restitution there would fully compensate the Pedro class.

14      So when you're looking at the -- you're looking at the

15  overlap of relief.  When you're talking about the same purchase

16  of the same product and they're both seeking restitution, you

17  know, there is only restitution up to a certain amount.  And

18  when both parties are seeking it, you can't get double

19  restitution on a single purchase.  I think everybody can

20  acknowledge that.

21      So, you know, you've got to look at the scope of the

22  relief here that is sought and get a little bit underneath the

23  claims because if the Retta class, the putative class, is

24  seeking full restitution of the same purchases that members of

25  the Pedro class is, there's certainly overlap in the relief

Exhibit 3 - Page 32

 1    sought.

 2        **THE COURT:**  Yes.  It would appear that what the

 3    plaintiffs are saying clearly, at least in the case that we

 4    have in front of me, is this stuff isn't worth anything because

 5    I paid for a whole bottle.  Someone isn't going to say, "Okay.

 6    You got half a bottle's worth," you know, because half the time

 7    it's not even usable at the point -- it's already opened up at

 8    a time they didn't want to drink it.

 9        So you've got -- the plaintiffs here are making a fairly

10    good case for this, "I didn't get anything I could use."

11    Sometimes you can say that if something had a little less

12    vitamins or a little more of something that somebody thought

13    they didn't want, that it still had some value and still tasted

14    good, it still had some benefit.

15        The plaintiffs here are claiming it's just unusable.  They

16    may be right in that if they proved everything up.  Maybe that

17    argument isn't quite as strong in Retta, although if someone

18    says, "Look, I wouldn't have had this if I thought it had a

19    level of alcohol in it.  You know, I don't drink alcohol or

20    certainly not anything that's any kind of significant amount of

21    it," you know, that might be different.

22        **MR. VOELZ:**  Well, Your Honor, I mean, I think even in

23    the Pedro case there is -- there is no -- the appropriate

24    measure of damages, and we're well beyond where we need to go

25    here today, but the appropriate measure of damages is a premium

Exhibit 3 - Page 33

1   here in these types of cases.  I don't think -- I think that's

2   pretty well established at this point.

3       I don't think -- but both -- but for the purposes of

4   whether or not a transfer or even a stay is appropriate, both

5   Pedro and Retta are trying to establish, you know, restitution,

6   and restitution possibly to the full amount of the product

7   sale, which when you're talking about the sale of the same

8   bottle, you know, that is seeking overlapping relief.

9       Now, they may arrive at it differently by someone saying

10  some percentage of these bottles fizz when they open and you

11  lose some product.  You know, whether or not that can be done

12  on a class-wide basis, obviously we're not there yet, but --

13      **THE COURT:**  That's kind of an interesting question of

14  whether someone bought it and it didn't open up, and are they

15  going to get all their money back if they didn't even lose any

16  product or just part of it.

17      So, yes, there are all kinds of issues here that maybe

18  this claim -- this case raises that the other case doesn't -- I

19  don't know -- in terms of how you're going to even define a

20  class.

21      **MR. VOELZ:**  But the question -- but what they're

22  seeking in terms of the relief, the restitution, and as we

23  pointed out in part the injunctive relief, is overlapping.  And

24  so for the purposes of a transfer analysis, you know, certainly

25  that criteria is met.

Exhibit 3 - Page 34

1     **THE COURT:**  Well, some of the relief, if you're going

2     to have the same people having bought the same bottle for

3     purposes of, let's say, the alcohol claim -- okay -- so you've

4     got the alcohol claim and you've got some class member in LA

5     that's the same class member in our case -- right? -- up here.

6     In other words, they bought this bottle.  They're not happy

7     about the alcohol in it.  They're only going to get whatever

8     that damage is worth once in one case, not in both is what

9     you're saying; right?

10     **MR. VOELZ:**  Right.

11     **THE COURT:**  Okay.  Then you have some other

12     complaints, though, that's kind of interesting.  The people in

13     this case can always tack on, "And, by the way, there's no

14     antioxidants in this stuff that you told me there was."  That's

15     not hard for them to do, but I don't know if everybody in our

16     case even is supposed to have had a bottle that opened up.  I

17     don't think that's how the class is defined.  So that's kind of

18     interesting.

19          And then again there are going to be some of the same

20     people, obviously, that are in the LA case.  But the Retta case

21     only has people who bought the Enlightened product, so there

22     will be more people, arguably, in the current class here in

23     this court in the Pedro case because -- well, let's see, the

24     class is defined as bought either one, either the Enlightened

25     or the Classic?  Just bought --

Exhibit 3 - Page 35

1        **MR. VALLADARES:**  I believe so, Your Honor.

2        **THE COURT:**  Okay.

3        **MR. VALLADARES:**  Yes.

4        **THE COURT:**  So then --

5        **MR. VOELZ:**  But for a shorter time frame.

6        **THE COURT:**  Yeah.  I'm not quite sure, then, where

7    that's going.  Let's see how that matches up.  So you could

8    have people who didn't buy any of the Enlightened in your class

9    technically.

10        **MR. VOELZ:**  But, as I said, I think -- you know, I

11   think there's some real issues of class certification, which we

12   don't need to reach today, as to how you could define a class

13   as to whether or not -- you know, whether or not there's an

14   ascertainable loss when someone opens the bottle and they drink

15   it.  And there is no loss under their theory, so --

16        **THE COURT:**  Well, yeah, I'm questioning that at the

17   moment as just where that fits in.

18       Your class in Retta is certified?

19        **MR. VOELZ:**  Is not certified, Your Honor.

20        **THE COURT:**  That's right.

21        **MR. VOELZ:**  No, Your Honor.

22        **THE COURT:**  It's not certified either, but nobody's

23   claiming bottles exploding down there.

24        **MR. VOELZ:**  Correct.  They're antioxidant and alcohol

25   claims for the Enlightened line of products so that's what

Exhibit 3 - Page 36

 1  Pedro is about.

 2      **THE COURT:**  That's right.  If they were certified,

 3  then we wouldn't have the party issue either.

 4      Yeah.  Okay.  So, all right, the points that the defendant

 5  is making are that the claims overlap in *Adoma*.  The court

 6  noted -- although they ultimately didn't find the first-to-file

 7  rule applicable, the court did not feel that that discrepancy

 8  beyond the core overlap was going to be critical even though

 9  there were claims of off-the-clock in the main part of the

10  action and also on-the-clock claims that would be new if the

11  cases were put together or stayed.  You wouldn't have this

12  on-the-clock claim in the second action in the first one.

13      And the court didn't find that that was critical, but what

14  they -- they did find certain points of interest, as pointed

15  out by Mr. Valladares, at a later stage of their analysis in

16  terms of the relief.

17      In many respects Retta is a simpler case than the one

18  that's been filed here.  Retta has a class of people who all

19  bought -- arguably bought the single type of product and that

20  the content is the same for everybody.  The experience, if you

21  will, is the same for everyone.

22      In our case you have people that arguably have had

23  different experiences.  How that affects certification is

24  something, as pointed out by the defendant, can be taken up

25  later.

Exhibit 3 - Page 37

33

```
 1        Well, I'll have to think about it.  I do think it's an
 2   issue distinction not really so much a class distinction.  The
 3   class distinction is at a different point, and that -- does --
 4   there are some distinctions in how the class is defined, but
 5   what the people are seeking in terms of relief once you have
 6   either -- let's say you have the same people and then in one
 7   case they're seeking one kind of relief and making one kind of
 8   claim and in another case they're saying it differently.
 9   Ordinarily you say, "Shouldn't you all be in one case making
10   all of your complaints in one place?"  But there are some
11   distinctions here that I need to look at.
12        Is there anything else that you wanted to sort of address
13   that we haven't talked about before we end the hearing?  And I
14   should look, too, to see if I have any questions that I didn't
15   pose to you.
16        I wanted to know what the plaintiff thought, you know,
17   about whether they'd had any chance to deal with putting
18   everything together, and they still haven't.
19                    (Pause in proceedings.)
20        THE COURT:  Yeah, I think... It's just -- it's not
21   totally -- it's not totally matching up.  I've yet to have a
22   class action go to a jury trial; but if you had a jury trial,
23   it would be kind of interesting as to what the jurors would
24   have to decide.
25        In other words, if they got a verdict in Retta on the
```

Exhibit 3 - Page 38

1  alcohol mislabeling and we had the cases separate here, if it

2  was -- if the plaintiffs prevailed against the defendant, then

3  I gather that would be *res judicata* here on that claim but not

4  on the other claims. And whether the plaintiffs would care in

5  this case anymore if that were the verdict, I don't know.

6  What --

7       MR. VALLADARES: I think so. I think issue preclusion

8  or *collateral estoppel*, and that would work toward the

9  efficiency of the matter.

10      To the extent they overlap and they have some rulings in

11 the Retta case as to the defendants, they've had a full and

12 fair opportunity to present their arguments with respect to

13 that. If there are findings against them with respect to that,

14 judicial findings, they are collaterally estopped. They are

15 precluded from bringing that issue with respect to us.

16      But, Your Honor, I do want to point out just a couple

17 things. The *Alltrade* case that talks about -- it is the

18 Ninth Circuit case -- talks about making sure that we're not

19 looking at this -- that the courts don't look at this analysis

20 in a rigid, mechanical way.

21      And I know Your Honor knows that, but the importance of

22 looking at the matter individually for each case is for two

23 purposes: To achieve judicial economy but also to achieve

24 comprehensive resolution of the cases. And I can tell you that

25 resolution of the Retta matter does not resolve our issue. It

Exhibit 3 - Page 39

```
 1    doesn't.

 2           THE COURT:  Well, not all of them, no, it doesn't.  In

 3    the same light, let's say you did have an issue preclusion and

 4    actually then you'd have questions -- I don't think -- the

 5    class isn't barred by claim preclusion like -- in other words,

 6    if they go all the way to verdict before your case is tried,

 7    and then would they be able to say, "Well, your folks can't

 8    bring up anything about antioxidants because you could have

 9    brought that up in the other case and you didn't do it, and

10    you're the same people"?  Except they aren't all the same

11    people.  It starts getting -- it starts getting very confusing.

12    I don't know if it's better under those circumstances that

13    you're all in one place so you're all stuck with one ruling,

14    you know.

15           MR. VALLADARES:  I think that's why there was class

16    certification.  I think that would bind them, and people that

17    opt out of that are not bound by that.

18           THE COURT:  Well, let's say nobody opts out.  I mean,

19    who's going to bring a suit unless you go into Small Claims

20    Court and sue for whatever you paid for this package of -- how

21    much does it sell for?

22           MR. VOELZ:  It sells for between 3.50 and $4 a bottle,

23    and it doesn't -- and they are individual bottles generally,

24    Your Honor.

25           MR. VALLADARES:  And, of course, it depends on the
```

Exhibit 3 - Page 40

 1    market, Your Honor.  I've seen it more expensive than that.

 2         THE COURT:  Well, okay.  If you go to Safeway, it

 3    might be cheaper than Whole Foods.  But I don't even know if

 4    Safeway carries it.  But the idea is here you've got a

 5    bottle -- and how big are these bottles?  Like 10-ounce,

 6    12-ounce?

 7         MR. VOELZ:  No.  They're 12-ounce bottles.

 8         THE COURT:  12-ounce bottles.  Okay.  So you've got a

 9    12-ounce bottle and it costs 3, 4 bucks, and that's fairly

10    expensive.  But are you going to pay a filing fee to go to

11    Small Claims Court and say, "You know, I want to get my money

12    back because I kept buying this after the bottles exploded and

13    so I've got even more than $4 worth of damages here"?  I don't

14    think so.

15         So --

16         MR. VALLADARES:  Well, individuals, for instance,

17    Your Honor, in our case that have suffered significant, say,

18    personal damage -- in fact, I believe the lady that is pictured

19    in one of the declarations, Mr. Watson's declaration, obviously

20    she's pursuing her own claim.  She wouldn't --

21         THE COURT:  Well, she should.

22         MR. VALLADARES:  Yes.

23         THE COURT:  You know, she's not complaining about $4

24    worth of, you know, a bottle.  She's claiming she's got some

25    kind of physical injury; and then whether she proves it up or

Exhibit 3 - Page 41

1    not, I don't know, but it's a lot different claim.

2        But if you're going to say ultimately, "All of our people

3    are getting out because they got hurt or they've got property

4    damage claims," that doesn't really bode well for class

5    certification.  You won't have anybody left in your class.

6            **MR. VALLADARES:**  No, I'm not saying that, Your Honor.

7        And I want to focus on one thing.  We, right now, with our

8    experts or in a very short amount of time could fashion relief

9    that would render this product as it is, with the fermentation

10   and everything else that occurs, safe simply by changing the

11   bottle, by changing the cap, by changing the materials used in

12   the packaging, and it's not just labeling.

13       So it is quite different than what the plaintiffs are

14   arguing in the Retta case, and that's an alcohol content case.

15   It's more of misleading and getting market share for a product

16   that's labeled as this -- what is the new product called?  Not

17   the Classic but --

18           **THE COURT:**  You can't talk to him.

19           **MR. VALLADARES:**  Oh, I'm sorry.

20       I think it's called Enchanted or Enhanced.  Not the

21   Classic but the new one that's supposed to be nonalcoholic.

22           **THE COURT:**  It's Enlightened.

23           **MR. VALLADARES:**  Enlightened.  Thank you, Your Honor.

24   I'm now enlightened with that fact.

25           **THE COURT:**  All right.  Well, you made that point

Exhibit 3 - Page 42

several times.  We're talking about new points.  And actually

you didn't plead in any way, as far as I can tell, a focus on

safety packaging.  You do have that one-liner kind of thrown

in -- it's one word, "packaging and labeling" -- in a claim

that covers both types of complaints.  But nobody is really

focusing on the safety for the class action, and that's why --

that's what I asked earlier, whether anybody is saying they got

hurt or anything like that, and not for purposes of the class.

So maybe you could get that kind of relief anyway even if

there's no actual seeking of damages for any kind of injury;

but just on the argument it's unsafe, even if nobody even had

been hurt yet, but that's a point you've made about, you know,

five, six times now.  I'm not counting.

So we're talking about new points.  One of the points that

I raised as something of a new point is what happens down the

road if we didn't put the cases together.  What kinds of

difficulties would arise at that point in determining who's

bound by what that happened in the other case?

Your clients aren't interested in the antioxidant for this

case, so maybe they could just rely on the result.  But then

let's say there's a damage award in the Retta case, and then

how does that affect what the plaintiffs can do here?

In other words, they've been awarded damages for the

alcohol and possibly the antioxidant part, and let's say that's

just a lump-sum award.  What do you find the damages are in

Exhibit 3 - Page 43

```
 1   this case?
 2       As I say, I've never had a class action go to trial, so
 3   I'm not sure -- have either of you?
 4          MR. VOELZ:  Our firm has done it.  I have not
 5   personally done it.  I've come very close, Your Honor.
 6          THE COURT:  Come close.  How about you,
 7   Mr. Valladares?
 8          MR. VALLADARES:  Same with me, Your Honor.
 9   Mr. Yanchunis certainly has.
10          THE COURT:  So nobody has really seen what some jury
11   would have to do if they went to trial and what their
12   determinations would be.  But let's just say they make some
13   award on behalf of the class, and then you turn around and you
14   look at the case that we've got here and say, "Okay.  There's
15   this award.  What do we do with it?  We have another claim."
16       And assuming for a moment that the defendant can't say to
17   you as a class, "You could have brought that claim in the other
18   action and, therefore, you're barred by claim preclusion," just
19   for discussion -- I don't know, this is just for discussion --
20   then how are you going to get this other loss?  I mean, it's
21   just very weird.
22       Okay.  Now, if anybody has any thoughts about that, fine;
23   or if you just want to mull it, you can do that, and then we'll
24   have, like, one last word from the defendant if they've got
25   anything they want to say they didn't already say.
```

Exhibit 3 - Page 44

1      **MR. VOELZ:**  Well, Your Honor, I think we've covered

2   most of the ground we need to here, Your Honor; but, you know,

3   as I said, you know, when we focus on -- and, you know, we

4   could do it a couple different assumptions.  You were assuming

5   that we would lose.  What if we assume we win, the class is

6   certified and we win on summary judgment or we win at a jury

7   trial if one were to occur?

8           **THE COURT:**  Right.

9           **MR. VOELZ:**  And what if there's a class-wide

10  settlement at some point?

11          **THE COURT:**  That's different.  That's the most likely

12  result.

13          **MR. VOELZ:**  And if the restituionary -- if the

14  restituionary award or a settlement is, you know, some amount

15  of money per unit, you know, does that -- you know, does that

16  make someone whole?  Does it not make them whole?  Does it void

17  claims in the Pedro case?

18      I would submit that having one court addressing both cases

19  is the most logical, rational approach to that.  It prevents --

20  it doesn't prevent.  It increases the likelihood of

21  inconsistent judgments.

22      Just from a pure efficiency standpoint, you know, having

23  one court fully up to speed on these issues, you know, reduces

24  the burden on the system, I think.

25      So, you know, in terms of whether or not under a transfer

Exhibit 3 - Page 45

1    analysis this makes sense, I think it does.  You know, we've

2    moved some down the road with Retta further than we have here,

3    significantly further than we have here.

4        But, you know, I go back to the issue that, you know,

5    there is alcohol claims all through this Complaint, as you

6    yourself pointed out.  So, you know, the issues -- the issues

7    certainly overlap and, you know, the question of the degree of

8    overlap, I think it's sufficient for transfer.

9        **THE COURT:**  Okay.  Well, if you were to take your

10   theory that the defendant won in the Retta case, then that

11   would not bind any plaintiff who wasn't part of the Retta class

12   I guess.  At that point you'd almost have to say that the class

13   would have to be -- whatever's left of the class would be the

14   people who didn't buy the Enlightened.

15       You'd almost have a shrunken class at that point because

16   everybody else is stuck with at that point claim preclusion

17   having been a party to the Retta case.  And that's what's a

18   little odd, that you would have somebody in two cases arguing

19   the same point.  That's the part that feels odd, you know, and

20   not quite right.

21       And then the other is looking at the various arguments

22   that the plaintiff has made about what's going on here.  I

23   don't know, to be honest.

24       And one of the things I was concerned about was slowing

25   Retta down, but I don't know that we're really going to slow

Exhibit 3 - Page 46

1   them down if we were to transfer because certification hasn't

2   happened there yet.  Nobody even knows what that trial is going

3   to be like.  You know, we're in mid-April, and when's class

4   cert coming up?

5          **MR. VOELZ:**  It hasn't been set.

6          **THE COURT:**  It hasn't even been set.  So I don't think

7   that in that case that you're probably going to go to trial in

8   December because if a class is certified -- and it may well be

9   because there are fewer -- at least fewer issues in your case

10   than in the case here that bear on class cert.  So let's just

11   say it was certified.  Now everybody's got to deal with

12   everything and get ready for a trial that involves, I don't

13   know, how many -- are we looking at hundreds, thousands?

14          **MR. VOELZ:**  Of plaintiffs?

15          **THE COURT:**  Members.

16          **MR. VOELZ:**  Well, class members, hundreds of thousands

17   certainly, Your Honor.

18          **THE COURT:**  Okay.  So hundreds of thousands of

19   health-seeking plaintiffs as opposed to a couple.  Okay.  So it

20   could be a very different trial.

21      Hang on a moment.

22                (Pause in proceedings.)

23          **THE COURT:**  Oh.  Oh.  Oh, yes.  My clerk is just

24   reminding me of something on our schedule.

25      All right.  Well, I have a picture here.  And you-all make

Exhibit 3 - Page 47

 1   points that are worth considering.  There's no question about

 2   it.  I'm going to have to think about what you've said.

 3        I came out leaning toward, as you might have anticipated

 4   from what I said, leaning toward applying the first to file but

 5   not considering -- well, considering but actually preferring a

 6   transfer to a stay particularly so that the claims here that

 7   are different aren't held up.

 8        And I, frankly, don't think that this case is really going

 9   to hold up Retta or vice versa, but there are other issues now

10   that have been raised by Mr. Valladares that I think are

11   emphasized more in his oral presentation than perhaps his

12   predecessors made clear either in the Complaint or in the

13   filings that I do want to take another look at and consider

14   before I rule.

15        And I have a trial coming up Monday that I'll be engaged

16   in for at least two weeks.  If I can get out -- if I can get

17   this together and get out a fairly brief order so that I'm not

18   waiting until everything's through with the trial and all, I

19   might do that in preference to a long dissertation just because

20   we've had quite a discussion here, and I think that you

21   understand what factors I'm weighing in the process.

22        In the same light, if it's going to take longer anyway,

23   then I'll try and give you something that's a little more

24   detailed so you'll have that in hand.

25        Okay.  I think that's all we can do this morning.  So

Exhibit 3 - Page 48

1    thank you all very much, and that will conclude our hearing.

2         And we'll take up our next matter in chambers, Ms. Lucero,

3    I think, unless you'd rather do it out here.

4              **THE CLERK:**  I think chambers.

5              **ALL:**  Thank you, Your Honor.

6              **THE COURT:**  Thank you.

7                   (Proceedings adjourned at 10:04 a.m.)

8                         ---oOo---

9

10                   <u>CERTIFICATE OF REPORTER</u>

11         I certify that the foregoing is a correct transcript

12    from the record of proceedings in the above-entitled matter.

13

14    DATE:   Thursday, June 23, 2016

15

16

17

18    _____

19         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

20

21

22

23

24

25

Exhibit 3 - Page 49